## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| DANIELLE L. HECKATHORN, | CASE NO. 4:20-CV-02820-JRK |
| Petitioner, | JUDGE JAMES R. KNEPP II |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| TERI BALDAUF, in her official capacity as Warden, | **REPORT AND RECOMMENDATION** |
| Respondent. | |

### INTRODUCTION

On December 22, 2020, Petitioner Danielle L. Heckathorn ("Ms. Heckathorn"), a prisoner in state custody, filed a Petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. (ECF # 1). Respondent Teri Baldauf, in her capacity as Warden of the Ohio Reformatory for Women, filed a Return of Writ including the state court record (ECF #11, 11-1) on April 16, 2021. Ms. Heckathorn filed motions to supplement the record (ECF #3), to hold her habeas petition in abeyance (ECF #4), for discovery (ECF #5, 19), for an evidentiary hearing (ECF #14), and for appointment of counsel (ECF #15). After reviewing the parties' briefings (ECF #20, 21), I denied each of Ms. Heckathorn's motions. (ECF #22). Ms. Heckathorn motioned this Court for an extension of time to file her Traverse. (ECF #17). She was granted an extension of time until July 19, 2021. (Non-document entry dated June 28, 2021). Ms. Heckathorn mailed her Traverse on July 20, 2021, and it was docketed on July 29, 2021. (ECF #23). Sua sponte, I extended the time to file until July 20, 2021 and deemed the Traverse timely filed. (Non-document entry dated August 3, 2021).

1

The district court has jurisdiction over the Petition under § 2254(a). This matter was referred for a Report and Recommendation pursuant to Local Rule 72.2(b)(2), and was reassigned to me on May 20, 2021, pursuant to General Order 2021-06. (Non-document entry dated May 20, 2021). For the reasons discussed below, I recommend the Petition be **DENIED**.

FACTUAL BACKGROUND

For purposes of habeas corpus review of state court decisions, findings of fact made by a state court are presumed correct and can be contravened only if the habeas petitioner shows, by clear and convincing evidence, erroneous factual findings by the state court. 28 U.S.C. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530.

In its opinion affirming Ms. Heckathorn's convictions, the Seventh District Court of Appeals summarized the underlying facts as follows:

> On Sunday, March 8, 2015, a distressed man appeared at the Columbiana County Sheriff's Department to report that his neighbor, Daniel Landsberger, confessed to killing a black male. Landsberger said the body was still in the bedroom of his trailer packed in snow and he was thinking of cutting it up and burning the mattress. The trailer was in a rural area with a steep, icy drive. The deputies attempted to gather support personnel and four-wheel-drive vehicles, but they were not able to respond until the next day.
>
> As a team from the sheriff's department approached Landsberger's trailer on March 9, he met them outside and provided consent to search. He had four scratches on the side of his neck that looked like fingernail scratches. The remains of a mattress and box spring were still smoldering in a fire pit in the yard. In the trailer, officers discovered blood in a bedroom containing an empty bed frame, and the wall behind the bed had blood spatter in the shape of the headboard that was no longer present. Below this was a small area of carpet saturated with blood. Objects near the adjacent wall also had blood spatter. There was "cast-off" blood identified on the ceiling; a BCI investigator explained this blood was cast from a moving object after it was used to hit a bleeding body. The bedroom appeared to have recently been used as a "walk-

2

in cooler" due to the lack of heat, open windows, six five-gallon buckets of melting snow, and a rolled towel under the door.

In Landsberger's SUV, officers found a small area saturated with blood in the cargo hold. Smears of blood were discovered on both rear passenger lower door frames and the inside of the back hatch. While a dog warden was attempting to secure a dog, a bag of dog food in a shed was opened and found to contain bloody items such as bed sheets, plastic sheeting, a garbage bag, and clothing (with an open condom in the pocket). Another condom and wrapper were recovered from the bedroom floor. No body or bloody weapon was discovered on the property.

Officers searched for Landsberger's female friend whom they concluded was Appellant Danielle Heckathorn (fka Eckhart). She was interviewed on Tuesday, March 10, 2015, the day after Landsberger was arrested for tampering with evidence. She said: Landsberger picked her up on Thursday; he had a black male named "Q" (the victim) in his car; they went to certain places and then to Landsberger's trailer; she and Landsberger used cocaine that night which she believed the victim provided; the condom in the bedroom may have been hers but was not from that night; when they were taking her home, Landsberger stopped the car, told the victim to get out of the car, and proceeded to beat him; Ms. Heckathorn locked the door out of fear, but the two men returned acting friendly to each other; the victim got in the back seat bleeding from his nose; Landsberger had scratches on his neck; and Landsberger took Ms. Heckathorn home. When a detective expressed he did not believe her story, Ms. Heckathorn admitted she had intercourse with both Landsberger and the victim that night, stating her services constituted her payment for drugs. She said Landsberger "ripped" the victim out of the car and beat him up in order to rob him; she also said the victim lost the crack cocaine during the fight, but they subsequently found it. She claimed the beating occurred at a pull-off for a recreation area, pointed out the area on a map, and said she could bring them to the location. She disclosed there was blood on the snow. She insisted the victim was awake when they dropped her off at home around 2:00 a.m.

The detective received a photograph of Quinn Wilson after texting another officer to say Ms. Heckathorn mentioned a black male named Q. Ms. Heckathorn identified the photograph of the victim. She then announced that she had the victim's phone, stating she used it because her phone had no service. When asked if she deleted messages from the victim's phone, she assured the detective she deleted no messages from his phone. She said she did not speak to Landsberger after the incident.

Ms. Heckathorn thereafter added a new part to her story; she said Landsberger instructed her to drive the car down the road during the beating. When confronted with her different versions of the story, she revealed the pertinence of text messages by claiming she thought Landsberger was joking when he texted her to say he would beat the victim up and "take his shit." She subsequently admitted going to Landsberger's residence a second time, after having sex in the bedroom but before

3

the robbery; she said this time Landsberger walked down to get vinegar in order to prepare crack for injection while she and the victim waited in the car at the top of the icy drive.

She said she deleted messages on her own phone (or her phone automatically deleted messages) when the memory became full. A detective brought Ms. Heckathorn to the recreation area so she could direct him to the pull-off where the incident allegedly occurred. A search was conducted that day and the next day, but no evidence of an altercation was uncovered.

On Wednesday, March 11, 2015, a man who lived on a dirt road found the victim's body on a hill by the road. He reported seeing a loud blue truck on the road the previous evening; after he thought it passed from hearing-distance, he heard its engine start, making him suspect someone was dumping tires or a deer carcass as they had in the past. When he inspected the property the next day, he found the bottom half of the body of a black male and then saw the top half of the body farther down the hill. This location was 1.7 miles from where Ms. Heckathorn resided and 8.8 miles from Landsberger's trailer.

The medical examiner concluded someone cut the body in half at the waist after death, first using a sharp knife-like instrument and then cutting through the bones in the pelvic area with a saw. The victim suffered multiple (at least 19) chopping "blunt-force injuries" to the head with "features of sharp-force injury" caused by an instrument such as a hatchet. The blows caused: a broken lower jaw on the left side; a left forehead injury; a base skull fracture which radiated from a hit on the top of the head; open skull fractures oozing brain tissue; seven overlapping blows to the right forehead and eye; blows to the right back of the head; crushed bones of the nose and cheeks; and a split maxilla caused by two chops to the upper lip. Death occurred within seconds to a few minutes after these blows. The victim also suffered a fractured right forearm prior to death which was not caused by a sharp object (but could have been caused by the opposite side of the sharp-edged object). The medical examiner found no evidence of blows from a fist.

The blood evidence from Landsberger's property matched the victim's DNA. Ms. Heckathorn was a major contributor to the DNA on the condom from the bedroom floor. DNA on the condom from the pocket of the victim's sweatshirt was a mixture consistent with the victim, Landsberger, and Ms. Heckathorn.

The police conducted the second interview of Ms. Heckathorn on April 24, 2015. She said she obtained the victim's phone at approximately 1:00 a.m. She claimed she listened to music on it, she tried to call a friend, and then it ran out of battery. She also explained she did not have sex with Landsberger that night as he could not obtain an erection; she had sex with the victim two times that night. Ms. Heckathorn mentioned a conversation on robbing the victim they had in person before the texts on the subject. In describing the victim's condition after the robbery, she said he

4

"was messed up" but not "terminal." She said Landsberger asked the victim if he wanted to go to the hospital.

Ohio's BCI recovered data deleted from the victim's phone, including forty-four contacts between Ms. Heckathorn and the victim. The phones of Ms. Heckathorn and Landsberger were not smartphones and were sent to the FBI for data extraction. The memory chip in Ms. Heckathorn's phone had many bad sectors which could no longer be read. The recovered texts demonstrate these gaps in the data extraction. Besides texts, the phones also showed calls between Ms. Heckathorn and the victim and between Ms. Heckathorn and Landsberger.

On Wednesday, March 4, 2015, the victim sent the following text at 3:08 a.m. telling Ms. Heckathorn: "I need that 800 so come thru for me make sure have some Yes cash to or lease try the more the better." After communications took place that are now unrecoverable, Ms. Heckathorn told the victim: "And no u cant guarantee its what we need. Even if everyone u know loves it. Some of the best stuff to others is worthless to us." Ten minutes later, she said, "Lmk when u gonna have some for me to test so we can get the flo rollin if its good." A few hours later, the victim indicated he could obtain "man" or "boy" if she could provide a ride and money; a detective explained "man" or "boy" is heroin. The victim spoke of his plan to have sex while he was in town. He also asked her to use her connections to find him a place to operate. Ms. Heckathorn replied that she did not know a place for him but did speak of providing him a "business opportunity" in Lisbon once she tested his product.

At 6:35 a.m., Ms. Heckathorn told the victim to "get like a 20 off every person u know that sell it. So we got better chance of findin the right stuff." (A "20" was said to be a portion of drugs.) While encouraging the victim to collect drugs for their next meeting, Ms. Heckathorn disparaged the victim to Landsberger, encouraging Landsberger to rob the victim. At 6:37 a.m., she texted Landsberger: *"Remember our robbery conversation yesterday?"* (Emphasis added.) Six minutes later, she told Landsberger: *"This nigger dumb as fuck and he wa/kin around w a bunch of shit bumming rides from pp/ he don't know and rippin pp/ off constantly. Hes ignorant, stupid, small, slow, and don't carry any weapons."* (Emphasis added.)

Over the next hour, Ms. Heckathorn told the victim to collect as many different kinds of "soft" that he could find "cuz soon as we find a winner we be getting major bank" and "once we find it u gonna be movin some serious weight." (A detective explained "soft" referred to cocaine and "hard" referred to crack.) There was an indication the victim wished to sell heroin and crack while Ms. Heckathorn was insisting on cocaine. Around 4:00 p.m., Ms. Heckathorn told the victim she was on the way to pick him up; other texts indicated a man drove them that evening.

The next day, Thursday, March 5, 2015, Ms. Heckathorn asked the victim if he had gas money and said: "You still owe for yesterday. Idk if he gonna do it" and "he hasn't answered yet but he just got off work so give a min." Around this same time, Ms.

Heckathorn texted Landsberger (at 3:33 p.m.) asking him to let her know when he finished work and stating, "That dude wants ride to ytown said hed make up for yesterday. *Should rob him Joi.*" (Emphasis added.) At 6:07, Ms. Heckathorn texted Landsberger: *"He getting da hard on a front so he aint gonna be worth rippin ti/ after ytown"* and *"Then we take him out in da country n leave him . .lol."* (Emphasis added.)

Landsberger sent multiple texts voicing he was "thinking about that hate sex" and "thinking about that good hate sex." He sent the following additional texts to Ms. Heckathorn: "U want 2 make it fri thirteen"; "We beat emm tp"; and "Do u want him beat up?" Ms. Heckathorn's answers to these texts were not recovered.

At 9:38 p.m., Ms. Heckathorn wrote a message which was saved as a draft, saying, "Its shootable." A message saved as a draft is not a sent message. A message can be saved as draft when a person starts typing but then: the person proceeds without hitting send; the phone is shut down; the phone runs out of battery; or the phone loses the signal.

At 12:53 a.m. (now Friday, March 6, 2015), Ms. Heckathorn sent a text to Landsberger declaring: *"Pick a place beat him n take his shit."* At *1:00 a.m., she texted him explaining, "There is no one. We going out there to take his shit n leave."* (Emphasis added.) At 1 :07 a.m., she repeated, "We aren't meeting anyone .. u know this right?"

*On the victim's phone,* a text was saved as a draft at 1:20 a.m. which stated, *"Jki/1."* Ms. Heckathorn's statement admitted she had possession of the victim's phone at this time. At 1:27 a.m., the victim's phone sent a text to Landsberger with the following instructions: *"/ dnt know u may have to do knock him out in here."* (Emphasis added.) Ms. Heckathorn typed a message on her own phone, which was saved as a draft at 2:13 a.m., reading: *"U got a crow bar? Knock him out and drag him out of carLa."* (Emphasis added.)

Landsberger sent a text *to the victim's phone:* "Some dumb nigger salen his shit. I Think I might of fucked him up and took his stuff. Was it ok?" At 3:41, Ms. Heckathorn used her phone to ask Landsberger, "Wat u do w him?" She also advised, "And u can smk it. Recook." Landsberger texted Ms. Heckathorn's phone: "He be at my place. dont k just yet what to" and then "This nigger stinks. Now I defenatly need to clean bed lin .. he sleeping."

Ms. Heckathorn texted Landsberger at 5:22 a.m. to say *"That def didn't go as plan," and minutes later, she added, "Evidently I do have conscience."* (Emphasis added.) Landsberger sent texts to Ms. Heckathorn asking for encouragement and worrying he would "lose [her] over this." Ms. Heckathorn texted Landsberger about being sick from drugs, and Landsberger said he "got drunk last nite didn t get home till ten." He told her, "Need to deleat." Ms. Heckathorn responded, "Am now" at 12:11 p.m. on Friday. That day, they texted about Landsberger bringing more drugs to her

house. He also texted, "No i ok not a violent man just wanted to be with u .sorry for asking. I dont k what ur gone through."

On October 15, 2015, after receiving the information extracted from the three phones, the police conducted a third interview with Ms. Heckathorn. She said she had sex with the victim in the trailer and later in Landsberger's vehicle in his driveway while Landsberger went to the trailer. She reiterated her story that she only saw a fight and robbery at the recreation area which occurred after the visits to the trailer. She also maintained that she only used the victim's phone to listen to music and to call a friend until the battery died. She expressed the robbery was not premeditated before the victim entered the car; she also said she was not aware Landsberger planned to hurt the victim. Some texts were then read to her to dispute this. She thereafter admitted texting from the victim's phone.

When asked about the text telling Landsberger he may "have to knock him out in here," she claimed "in here" referred to the car at the recreation area, not while they were at the trailer; she denied being in the bedroom or present when Landsberger killed the victim, claiming he was alive when they brought her home some time before 3:00 a.m. She remembered her text about the crowbar, noting the plan was to beat up the victim. Upon being asked why she texted Landsberger to say the night did not go as planned, she replied, "I didn't expect him to beat the living shit out of the guy." After it was pointed out that she suggested the crowbar, she responded, "I'm thinking knock him out. Not beat 'em till he's almost dead." She said Landsberger was supposed to "conk 'em in the head a couple times and grab his stuff an we were gonna go." She estimated it was two degrees outside that night.

A stipulated polygraph examination, administered in September 2016, was admitted into evidence along with the examiner's testimony. Ms. Heckathorn's answers to the following four predisclosed questions indicated deception: "Did you see Quinn murdered?" (answer: "No"); "Were you in the bedroom when Quinn was murdered? (answer: "No"); "Was Quinn alive the last time you saw him? (answer: "Yes"); and "Were you in the trailer when Quinn was beaten to death? (answer: "No").

In addition to all of the evidence reviewed above, the state presented the testimony of a witness who testified the victim was one of her drug dealers. She said he was not a typical dealer as he was caring and was not violent even when he was owed money. Although the victim was generous, she said he would not lend out his phone. She bought crack from the victim on the afternoon of March 5, 2015, hours before his death. She thereafter went to her uncle's residence where she saw Ms. Heckathorn. Ms. Heckathorn indicated she would see the victim that night to repay a favor she owed him. This witness learned the victim was dead the next day.

The defense called Ms. Heckathorn's neighbor as a witness. Ms. Heckathorn lived with her parents; she helped at the neighbor's business and grew up with the neighbor's children. The neighbor testified she was awake doing paperwork on the

night of March 5 turning into March 6, 2015. She saw a dark SUV pull in Ms. Heckathorn's driveway "sometime after 1:30, two o'clock." She said she used binoculars and watched Ms. Heckathorn get out of the vehicle. (A detective testified the distance between the houses was 350 yards; and a map showed the neighbor's house was located much further back from the road than Ms. Heckathorn's residence). The neighbor said she heard two car doors shut, but the driver's door stayed closed (apparently suggesting a second passenger changed places after Ms. Heckathorn left the car). The neighbor admitted telling the police a year after the incident that this probably occurred closer to 3:30 a.m., but she pointed out she told them she would check her records.

*State v. Heckathorn*, No. 17 CO 0011, 2019 WL 1407197, at *1-5 (Mar. 25, 2019) (internal citations omitted), *motion for delayed appeal granted*, 131 N.E.3d 69 (Ohio) (table), *appeal not allowed*, 136 N.E.3d 501 (Ohio 2019); *see also* State Ct. Rec., Exh. 12, ECF #11-1, PageID 543-51.

## PROCEDURAL HISTORY

### State Court Conviction

On November 18, 2015, Ms. Heckathorn was indicted on seven counts: (1) murder (for purposely causing the death of another by aiding and abetting Landsberger); (2) tampering with evidence (for deleting evidence from Mr. Wilson's phone), a third degree felony; (3) conspiracy to commit robbery (for inflicting, attempting to inflict, or threatening physical harm while committing, attempting, or fleeing a theft offense), a third degree felony; (4) complicity to the same robbery (by aiding and abetting Landsberger), a second degree felony; and (5-7) obstructing justice (corresponding to the three police interviews), third degree felonies due to the type of offense being investigated. *Id.* at ¶ 28, PageID 550.

The case was tried to a jury over the course of five days. On April 10, 2017, the jury found Ms. Heckathorn guilty of all charges. The court sentenced Ms. Heckathorn to: 15 years to life for murder; 12 months for tampering with evidence; 6 years for robbery; and 12 months on each of the three counts of obstructing justice. The conspiracy to commit robbery count was merged with

the robbery count prior to sentencing. The court ordered the sentences to run consecutively for a total sentence of 25 years to life. *Id.* at ¶ 32, PageID 551.

<u>Direct Appeal</u>

Ms. Heckathorn, through counsel, filed a timely notice of appeal on May 25, 2017. (State Ct. Rec., Exh. 8, PageID 436-43). She asserted the following assignments of error in her brief:

1.  Danielle Heckathorn's conviction for complicity to murder for the death of Quinn Wilson was supported by insufficient evidence in violation of Ms. Heckathorn's right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution. (Sentencing T.p. 32; April 17, 2017 Judgment Entry; April 28, 2017 Judgment Entry).

2.  Danielle Heckathorn's convictions for obstructing justice were supported by insufficient evidence in violation of Ms. Heckathorn's right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution. (State's Exhibit 27 A; State's Exhibit 28A; State's Exhibit 29A; T.p. 824, 829-838, 1132, 1138, 1201; April 17, 2017 Judgment Entry; April 28, 2017 Judgment Entry).

3.  Ms. Heckathorn was denied a fair trial and due process of law by the admission of highly prejudicial photographs at trial, in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, Section 16, Article 1 of the Ohio Constitution, and Ohio Rules of Evidence 403 and 404(A). (T.p. 522, 1001-1002; April 17, 2017 Judgment Entry; April 28, 2017 Judgment Entry).

4.  Trial counsel provided ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). (T.p. 522, 1001-1002, 1182; April 17, 2017 Judgment Entry; April 28, 2017 Judgment Entry).

5.  Ms. Heckathorn's rights to a fair trial and due process of law were violated by the cumulative errors that occurred during her trial. Fifth and Fourteenth Amendments to the U.S. Constitution; Article I, Sections 10 and 16, Ohio Constitution. (T.p. 522, 760, 1001-1002, 1182; April 17, 2017 Judgment Entry; April 28, 2017 Judgment Entry).

6.  The trial court erred when it imposed consecutive sentences without expressly making the findings required by RC. 2929.14 during the sentencing

>     hearing. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d
>     659; R.C. 2828.14; R.C. 2941.25; R.C. 2951.041. (Sentencing T.p. 32;
>     4/17/17 Judgment Entry; 4/28/17 Judgment Entry).

(State Ct. Rec., Exh. 9, PageID 445-47). Following a full briefing by the parties, the Ohio Seventh

District Court of Appeals affirmed Ms. Heckathorn's convictions. In its entry dated March 25,

2019, it remanded the case for a nunc pro tunc order to incorporate sentencing findings into the

entry. (State Ct. Rec., Exh. 13, PageID 573).

Acting *pro se*, Ms. Heckathorn filed an untimely notice of appeal in the Ohio Supreme

Court on July 19, 2019, and on the same day, filed a motion for delayed appeal. (State Ct. Rec.,

Exh. 13, 14, PageID 574-616). The Ohio Supreme Court granted her motion for delayed appeal.

(State Ct. Rec., Exh. 15, PageID 617). In her Memorandum in Support of Jurisdiction, Ms.

Heckathorn raised the following:

1.    Prosecutorial Misconduct as it relates to appellate level arguments.

2.    Ineffective assistance of counsel as it relates to appellate level arguments.

(State Ct. Rec., Exh. 16, PageID 618-28.) The Ohio Supreme Court declined to accept jurisdiction

of this appeal. (State Ct. Rec., Exh. 18, PageID 639).

During the pendency of her previous appeal, on October 29, 2018, Ms. Heckathorn filed a

*pro se* petition to vacate or set aside judgment of conviction or sentence in the Columbiana County

Court of Common Pleas. (State Ct. Rec., Exh. 19, PageID 640). She then filed a second petition

for Post-Conviction Relief under Ohio Revised Code 2953.21 on November 2, 2018, and later

included an addendum to this petition. (State Ct. Rec., Exh. 20, 21, PageID 679-723).

In that filing, Ms. Heckathorn raised several claims, including "unjustified bias" in part

resulting from media coverage, ineffective assistance of counsel, prosecutorial misconduct,

admissibility and/or validity of evidence, and cumulative error. *Id.*

10

On November 28, 2018, the state filed a motion requesting the court summarily dismiss Ms. Heckathorn's petition for post-conviction relief, and included a response to the addendum. (State Ct. Rec., Exh. 22, 23, PageID 724-53). The trial court dismissed Ms. Heckathorn's petition, supplement, and related motions on December 27, 2018. (State Ct. Rec., Exh. 24, PageID 754).

On January 25, 2019, Ms. Heckathorn, now appearing with counsel, filed a notice of appeal with the Seventh District Court of Appeals. (State Ct. Rec., Exh. 25, PageID 755-57). In her brief, she set forth the following:

1.   The lower court erred by summarily dismissing Heckathorn's petition for post-conviction relief without an evidentiary hearing.

2.   The lower court erred by summarily dismissing Heckathorn's petition for post-conviction relief without making and filing findings of fact and conclusions of law.

(State Ct. Rec., Exh. 26, PageID 775-84). Both parties filed briefs in response. (St. Ct. Rec., Exhibit 27, 28). On February 28, 2020, the Seventh District affirmed the trial court's decision. (State Ct. Rec., Exh. 29, PageID 816-30; *see also State v. Heckathorn*, No. 19 CO 0004, 2020 WL 1487279 (Ohio Ct. App. Feb. 28, 2020)). Ms. Heckathorn, through counsel, then filed an untimely notice of appeal to the Ohio Supreme Court. (State Ct. Rec., Exh. 30, PageID 831-33). Due to its untimeliness, Ms. Heckathorn filed a motion for leave to file delayed appeal, which the Ohio Supreme Court granted. (State Ct. Rec., Exh. 31, 32, PageID 834-37).

In her brief to the Ohio Supreme Court, Ms. Heckathorn asserted the following propositions of law:

1.   Did the appellate court err by issuing a *per se* ruling that an ineffective assistance of counsel claim based upon new evidence outside the record, is never a viable petition claim under R.C. 2953.21?

2.   Did the appellate court err when it determined that individual findings of fact and conclusions of law by the trial court were not required on grounds which were barred by res judicata?

11

3.      Did the lower courts abuse their discretion when they made the ruling that Ms. Heckathorn was not denied effective assistance of counsel?

4.      Did the lower courts err when they adopted the state's reasoning for dismissal; improperly considering said reasoning to be an adequate finding of fact and conclusion of law?

(State Ct. Rec., Exh. 33, Page ID 863). After party briefing, the Ohio Supreme Court declined to accept jurisdiction on January 22, 2021. (State Ct. Rec., Exh. 35, PageID 881; *see also State v. Heckathorn*, 161 N.E.3d 684 (2021) (table)). On January 27, 2021, Ms. Heckathorn moved for reconsideration of denial of the jurisdictional appeal. (State Ct. Rec., Exh. 36, PageID 882-84). The Ohio Supreme Court denied that request on March 30, 2021. (State Ct. Rec., Exh. 37, PageID 885; *see State v. Heckathorn*, 162 N.E.2d 1413 (2021)).

## FEDERAL HABEAS CORPUS

Ms. Heckathorn's Petition sets forth fourteen putative grounds for relief, as follows:

1.      The prosecutors for the State committed prosecutorial misconduct; up to and including suborning perjury, the filing of misleading documents, Brady violations, and allowing false testimony to stand without correction during Ms. Heckathorn's trial – in violation of her Sixth Amendment right to a fair trial and her Fourteenth Amendment right to due process.

2.      Prosecution commiied [*sic*] misconduct, trial counsel was ineffective, and the trial court abused it's [*sic*] discretion by allowing the admittance of highly prejudicial photographs and statements; violating Ms. Heckathorn's 5th, 6th, and 14th Amendment rights to the U.S. Constitution, as well as the Ohio Constitution Article 1 section 16, and Ohio Evidence Rules 403 and 404(A).

3.      Prosecutor committed misconduct and prejudiced Ms. Heckathorn's case by riding on the bus with the jury for the jury view – where no member of the defense was present, and no record was kept of proceedings or communications – then making unsanctioned stops on that Jury view and interjecting more prejudice. Jurors were not rehabilitated, violating Ms. Heckathorn's right to a fair trial, to an impartial jury, and to due process.

4.      Trial counsel, Peter Horvath, provided ineffective assistance of counsel, resulting in violations of Ms. Heckathorn's 5th, 6th, and 14th Amenment [*sic*] rights to effective counsel, fair trial, and impartial jury, the right to present a complete defense, and the right to due process.

12

5.      Insufficient evidence to sustain a conviction for Complicity to Murder under O.R.C. 2903.02(A) and O.R.C. 2923.03(A)(2); in violation of her 5th and 14th Amendment U.S. Constitutional right to Due Process, and Ohio Constitution Article 1 section 10.

6.      Insufficient evidence to sustain a conviction for multiple Obstruction charges and/or a conviction for Complicity to Robbery; violating her right to due process under the 5th and 14th Amendments to the U.S. Constitution and Ohio Constitution Article 1 section 10.

7.      Insufficient evidence to sustain a conviction for Tampering with Evidence, violation Ms. Heckathorn's right to Due Process under the 5th and 14 [*sic*] Amendments to the U.S. Constitution, and the Ohio Constitution Article 1 section 10.

8.      The prosecution committed misconduct, counsel was ineffective, and the trial court abused it's [*sic*] discretion when it imposed consecutive sentencing without making the finding required by O.R.C. 2929.14 during the sentencing hearing.

9.      Exculpatory and inculpatory evidence was withheld from the defense in violation of Ms. Heckathorn's 5th and 14 [*sic*] Amendment U.S. Constitutional rights to a fair trial and due process.

10.     The trial court committed prejudicial error, and the prosecution committed misconduct, when it allowed Detective Haught to interpret text messages; without necessity, without being qualified, and without taking an interpreter's oath; violating Ms. Heckathorn's 5th and 14th Amendment U.S. Constitutional rights to a fair trial and due process.

11.     The trial court abused it's [*sic*] discretion and committed prejudicial error by allowing the admission of third-hand hearsay, in violation of the Confrontation clause, and in violation of Ms. Heckathorn's 5th and 14th Amendment U.S. Constitutional rights to a fair trial and due process.

12.     The trial court erred, the prosecution committed misconduct, and counsel was ineffective, for allowing the admission and use of an improperly conducted polygraph test to infer guilt to the jury.

13.     The local Sheriff's Department and the detectives in this case performed an inadequate investigation, leading to a substansive [*sic*] violation of the petitioner's 5th and 14th Amendment rights to Due Process, as well as depriving her or [*sic*] her 6th Amendment right to present a complete defense.

14.     Cumulative Error and the resulting prejudice at the trial of petitioner Danielle L. Heckathorn caused the defendant to be denied her rights to a fair

trial, an impartial jury, effective assistance of counsel, the presentation of a complete defense, and substansive [*sic*] due process.

(Pet. Compl., ECF Doc 1, PageID 5-32).

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) cleaned up). An application for habeas corpus cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). Thus, this Court may grant habeas relief if the state court arrives at a conclusion that is contrary to a decision of the U.S. Supreme Court on a question of law, or if the state court decides a case differently than did the Supreme Court on a materially indistinguishable set of facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The appropriate measure of whether a state court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Id.* at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well

14

understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

DISCUSSION

As noted above, Ms. Heckathorn's Petition raises fourteen grounds, each of which are addressed below.

## I.     CLAIMS NOT COGNIZABLE IN THIS COURT

Certain of Ms. Heckathorn's claims in her federal habeas petition are not cognizable in this Court, namely the state law violations alleged in Grounds Two, Five, Six, Seven, Eight, and Fourteen. I discuss them below.

### A.     State Law Claims

In Grounds Two, Five, Six, and Seven, Ms. Heckathorn alleges her rights under Article 1, Sections 10 and 16 of the Ohio Constitution were violated. She further alleges in Count Two that the admission of certain photographs violated Ohio Evidence Rules 403 and 404(A). *Federal* habeas corpus relief is available only to correct *federal* constitutional violations. 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010). Federal habeas courts may not reexamine state court determinations on questions of state law. *Wilson*, 562 U.S. at 5. Because Ms. Heckathorn's claims raise issues arising under state law, they are not cognizable in this Court.

In Ground Eight, Ms. Heckathorn alleges the trial court abused its discretion by imposing consecutive sentences without making required findings under Ohio Revised Code §§ 2929.14 at the sentencing hearing. Although she attempts to raise this issue as a violation of her federal Constitutional rights through allegations of prosecutorial misconduct and ineffective assistance of counsel, her assertions are unavailing. In her direct appeal, Ms. Heckathorn argued her sentence contravened Ohio law. (Pet. Compl., ECF Doc. 1, PageID 20). As previously stated, federal habeas

15

relief is available only to correct federal constitutional violations, and federal habeas courts may not reexamine state court determinations on questions of state law. *Wilson*, 562 U.S. at 5.

Therefore, Ms. Heckathorn's claims under the Ohio Constitution, the Ohio Revised Code, and the Ohio Rules of Evidence as asserted in Grounds Two, Five, Six, Seven, and Eight are not cognizable in this Court and must be dismissed without prejudice for failure to state a claim.

### B.    Cumulative Error

In Ground Fourteen, Ms. Heckathorn argues she was deprived of a right to a fair trial due to cumulative error. But 28 U.S.C. § 2254 limits relief to state prisoners who are being held in violation of federal constitutional law. A federal court may only grant habeas relief if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). When making a determination under subsection (d)(1), this Court must look to the holdings, not the dicta, of Supreme Court decisions. *Howes v. Fields*, 132 S. Ct. 1181, 1187 (2012). "The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). As a result, the Sixth Circuit standard is that "cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken to this issue." *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006). There can be no "unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Harrington*, 562 U.S. at 101. Because the U.S. Supreme Court and the Sixth Circuit do not permit federal habeas relief based on cumulative error, Ground Fourteen is not cognizable in this Court and must be dismissed without prejudice for failure to state a claim.

II.     CLAIMS UNDER THE UNITED STATES CONSTITUTION

Ms. Heckathorn's cognizable claims under the U.S. Constitution are addressed in detail below.

A.      Claims Not Fairly Presented And Procedurally Defaulted

A number of the claims Ms. Heckathorn alleges in her Petition were not previously brought in her state court appeals and have not been fairly presented. As discussed below, these grounds are procedurally defaulted.

 Although distinct, the exhaustion doctrine and procedural default are interrelated. Federal law bars habeas relief "unless it appears that the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b). The exhaustion doctrine gives state courts the opportunity to correct any constitutional errors in the first instance, before those claims may be presented to federal courts. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-845 (1999). For purposes of the exhaustion requirement, fair presentation of a claim in state court requires the petitioner to present both factual and legal bases for the claim. *Gross v. Warden, Lebanon Corr. Inst.*, 426 F. App'x 349, 358 (6th Cir. 2011). The same claims under the same theories must first be presented to the state court to alert it to the presence of a federal question. *See Baldwin v. Reese*, 541 U.S. 27, 34 (2004).

A petitioner may procedurally default a claim by failing to raise and pursue that claim through the state's ordinary appellate procedures. *O'Sullivan*, 526 U.S. at 847. This includes both delayed appeals and direct appeals. *Collins v. Perini*, 594 F.2d 592, 593 (6th Cir. 1979). Further, a claim is procedurally defaulted if, at the time of the federal habeas petition, state law no longer allows the petitioner to raise her claim. *Gray v. Netherland*, 518 U.S. 152, 161 (1996).

Ohio law is clear that a habeas petitioner such as Ms. Heckathorn may not obtain post-conviction relief under Ohio Revised Code §§ 2953.21, *et seq.* for any grounds for relief that could have been raised at trial or on direct appeal but were not. *Collins*, 594 F.2d at 593 (collecting cases). Ms. Heckathorn did not previously raise Grounds One, Three, Nine, Ten, Eleven, Twelve, and Thirteen in her state court appeals. (*See* State Ct. Rec., Exh. 9, 11, 16, 19-21, 26, 28, 33, PageID 444-92, 524-40, 618-29, 640-723, 758-88, 807-15, 856-74). Because those claims are procedurally defaulted, this Court may not address their merits.

**B.    Remaining Federal Claims**

Five of Ms. Heckathorn's remaining grounds for habeas relief survive for this Court's review. However, as stated above, the AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt." *Bell,* 543 U.S. at 455 (cleaned up). The state court's findings of fact are presumed to be correct, and to be overturned, the state court's application of Supreme Court precedent must be objectively unreasonable. *Bailey v. Mitchell*, 271 F.3d 652, 655-56 (6th Cir. 2001). A federal court may grant a writ of habeas corpus only where the state court arrives at a conclusion or result that is contrary to the holdings of the U.S. Supreme Court on a question of law or in a case with materially indistinguishable facts. *Williams*, 529 U.S. at 405. Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). I address the federal habeas claims contained in Grounds Two, Four, Five, Six, and Seven under this deferential standard.

*Violations of the Fifth, Sixth, and Fourteenth Amendments*: In Grounds Two and Four, Ms. Heckathorn states that her Fifth, Sixth and Fourteenth Amendment rights were violated and that

18

she was denied a fair trial, impartial jury, the right to present a complete defense, and due process. (Pet. Compl., ECF Doc 1, PageID 5-13).

Ground Two alleges the admission of prejudicial photographs depicting Quinn Wilson's bisected body violated Ms. Heckathorn's federal constitutional rights. (*Id.* at PageID 8). Ground Four alleges Ms. Heckathorn's federal constitutional rights were violated due to ineffective assistance of trial counsel. (*Id.* at PageID 12). Ms. Heckathorn claims these constitutional violations occurred as a result of prosecutorial misconduct, ineffective assistance of counsel, and the trial court's abuse of discretion. *Id.*

Both Grounds Two and Four claim ineffective assistance of counsel. To prevail on her ineffective assistance of counsel claim, Ms. Heckathorn must demonstrate that counsel's performance was so deficient that it resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This deferential standard requires a reasonable probability that but for counsel's errors, the results of the proceedings would have been different. *Id.* at 694. And at the habeas stage, the question is not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel's conduct satisfied the deferential standard in *Strickland*. *Premo v. Moore*, 562 U.S. 115, 123 (2011).

Ms. Heckathorn's claims are unavailing. The trial court's abuse of discretion is not cognizable on federal habeas review unless she can demonstrate that the evidentiary ruling of the trial court "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974). By extension, if this evidence is admissible, the prosecution's act of offering the photos into evidence was not misconduct.

The Seventh District Court of Appeals, in reviewing these claims, found that the admission of these photographs—despite their gruesome nature—was more probative than prejudicial, served

an evidentiary purpose at trial, and did not compromise Ms. Heckathorn's substantial rights. (State Ct. Rec., Exh. 12, PageID 561-65). Ms. Heckathorn has not provided clear and convincing evidence necessary to demonstrate that admission of these photographs so infected her trial with unfairness that she was denied due process as a result. She has not demonstrated that her trial counsel's performance was so deficient it resulted in prejudice. For these reasons, Grounds Two and Four fail.

*Insufficient Evidence*: In Grounds Five, Six, and Seven, Ms. Heckathorn alleges the trial court had insufficient evidence to sustain her convictions for Complicity to Murder, Complicity to Robbery, Obstruction, and Tampering with Evidence. (Pet. Compl., ECF Doc. 1, PageID 14-19). She claims that the insufficiency of the evidence in these charges amounted to a violation of her right to due process under the Fifth and Fourteenth Amendments. *Id.*

For a challenge to a conviction to succeed based on sufficiency of the evidence, a habeas court must determine, based on the record at trial, that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S 307, 324 (1979). *Jackson* claims face the high burden of two layers of judicial deference. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). First, the state court on direct appeal may set aside the jury's verdict on insufficient evidence only if no trier of fact could have agreed with the jury. *Id.* And second, the habeas court may only overturn if the state court decision was "objectively unreasonable"—it may not overturn simply because the federal court disagrees with the state court's result. *Id.* (internal quotations and citations omitted).

In her pleadings before this Court, Ms. Heckathorn asserts she is innocent of the murder of Quinn Wilson—she was not present at the murder scene and she was unaware of any events after she was dropped off at home that fateful night. (*See, e.g.*, Pet. Reply, ECF Doc. 23, PageID

20

2288-89, 2295-98.). In this sufficiency of the evidence argument, she continues to conflate her innocence of the actual murder with her innocence of the convictions with which she was charged, namely complicity, obstruction, and tampering with the evidence. These convictions require only the demonstration that she intended to aid and abet in Mr. Wilson's murder, and that she attempted to throw the investigation off her tracks. A reasonable jury could—and did—find these elements were met.

On review, the state court agreed. Citing to *Jackson* and applicable Ohio law, the state appellate court determined, based on the totality of the evidence examined in a light most favorable to the State, that some rational juror could find Ms. Heckathorn aided and abetted in the murder of Mr. Wilson. (State Ct. Rec., Exh. 12, PageID 557). The Seventh District found the same regarding Ms. Heckathorn's hindrance of the state's investigation and resulting charges. (*Id.* at 465-66). Therefore, the appellate court's determination was a reasonable application of the correct and controlling United States Supreme Court precedent. There is no basis to overturn the state court determination. Ms. Heckathorn's assertions in Grounds Five, Six, and Seven also fail.

CONCLUSION AND RECOMMENDATION

Following review, and for the reasons stated above, I recommend the Petition be **DENIED**

on all asserted grounds. I further recommend that Ms. Heckathorn not be granted a certificate of

appealability.

Dated: <u>August 9, 2021</u>

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

*ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. See <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).*

22